## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 1:23-cv-00721-RMR-SBP

DANIELLE THOMAS,

      Plaintiff and Counterclaim Defendant,

v.

ANGUS ACKERMANN,

      Defendant, Counterclaim Plaintiff, and Third-Party Plaintiff,

v.

CHRISTINE THOMAS and
TYLER MILLER,

      Third-Party Defendants.

---

## ORDER ON MOTIONS TO QUASH AND FOR ATTORNEY FEES

---

**Susan Prose, United States Magistrate Judge**

      This matter is before the court on five motions to quash subpoenas issued in the course of discovery in this action. The motions, which are further described below, are found at docket entries ECF Nos. 67, 68, 69, 72, and 74. The court refers to these filings collectively as the "Motions" or "Motions to Quash." The court considers the Motions pursuant to 28 U.S.C. § 636(c), the Order Referring Case for all purposes dated April 6, 2023, ECF No. 13, and the specific orders of reference for each Motion, ECF Nos. 70, 73, and 75. After review of the Motions and extensive supporting written materials submitted by the parties, the entire docket, and the applicable law, the Motions are **GRANTED in part** and **DENIED in part** for the

reasons stated herein. The court also has before it a motion for attorney fees (ECF No. 89), which the court **DENIES**.

## BACKGROUND

This federal lawsuit stems from what, by all accounts, was a brief encounter between two college freshmen—Plaintiff Danielle Thomas and Defendant Angus Ackermann—in a dormitory room at the University of Denver ("DU" or the "University") on March 3, 2022. Their accounts of the incident differ greatly. In the operative complaint, Ms. Thomas alleges that Mr. Ackermann became verbally and physically aggressive toward her and repeatedly struck her with a lacrosse stick. Amended Complaint, ECF No. 86 ¶ 5(c). Mr. Ackermann denies Ms. Thomas's allegations. This litigation ensued, in which Ms. Thomas brings state tort claims against Mr. Ackermann for assault, battery, false imprisonment, and extreme and outrageous conduct. *Id.* ¶¶ 7-22. Mr. Ackermann has filed counterclaims against Ms. Thomas, her mother (Christine Thomas), and Tyler Miller, another DU student who is alleged to be Ms. Thomas's boyfriend and Mr. Ackermann's roommate at the time of the incident.[1] Those counterclaims—for abuse of process, defamation, and civil conspiracy, ECF No. 91 ¶¶ 83-111—rest on Mr. Ackermann's contention that the counterclaim defendants made up the story about what transpired in the dorm room for the purpose of creating and publishing a "false narrative" about Mr. Ackermann "with the intent and motive of bolstering a financial award in a later civil suit." *See id.* ¶¶ 71, 74, 75, 80.

As particularly pertinent to the issues the court must resolve in connection with the

---

[1] For clarity, the court will refer to Plaintiff Danielle Thomas as either Danielle Thomas or Ms. Thomas, and to her mother as Christine Thomas.

disputed subpoenas, Ms. Thomas seeks a plethora of non-economic damages, which she summarizes as follows: "past and future such damages relative to physical and mental pain and suffering, impairment of quality of life, emotion[al] stress and inconvenience at a range of up to $250,000.00 - $400,000.00." July 18, 2023 Scheduling Order, ECF No. 56 at 4.[2] Further, in connection with the damages picture, this court granted Ms. Thomas's motion to add a request for exemplary damages against Mr. Ackermann on January 10, 2024. ECF No. 85.

As part of discovery in this case, Mr. Ackermann proposed to serve four subpoenas:

1.  On November 1, 2023, a subpoena duces tecum on non-party University of Denver ("DU Subpoena"), ECF No. 67-1, which seeks ten categories of documents:
    (1) All DU transcripts for Danielle Thomas and Tyler Miller;
    (2) All Communications relating to Danielle Thomas or Tyler Miller's grades;
    (3) All Communications between any DU Personnel on the one hand and either (a) Danielle Thomas, (b) Christine Thomas, or (c) Tyler Miller on the other hand;
    (4) All Communications between any DU Personnel about, or including reference to, (a) Danielle Thomas, (b) Christine Thomas, or (c) Tyler Miller;
    (5) All Documents reflecting any treatment for Danielle Thomas at any counseling, medical, mental health facility at DU;
    (6) All Documents reflecting any treatment for Danielle Thomas for any counseling, medical, or mental health services at DU;
    (7) The name, permanent home address, and telephone number of any student who was assigned to reside in any dormitory room with Danielle Thomas during the 2021-2022 academic year at DU;
    (8) All Documents relating to Danielle Thomas's DU accommodation request(s);
    (9) All Documents relating to Danielle Thomas and Tyler Miller's requests to study abroad, including but not limited to their application materials, the program, and Documents approving their requests; and

_____

[2] Originally, Plaintiff also sought damages for "[p]hysical impairment: past and future such damages/losses at a range of $100,000.00 - $250,000.00." ECF No. 56 at 4. However, Plaintiff has since withdrawn that category of damages. ECF No. 120-1 at 3 (excerpt of Plaintiff's Sixth Amended disclosure statement, dated December 26, 2023).

(10) All Documents relating to any form of financial aid and/or scholarships that Danielle Thomas and Tyler Miller received for any DU enrollment period or program.

2. On November 1, 2023, a subpoena duces tecum on non-party Jefferson County, Colorado, Public Schools ("JCPS Subpoena"), ECF No. 69-1 at 13-19, the school district where Ms. Thomas attended high school, which seeks nine categories of documents:

(1) All transcripts for Danielle Thomas;

(2) All Communications relating to Danielle Thomas's grades;

(3) All Communications between any JCPS Personnel on the one hand and either (a) Danielle Thomas or (b) Christine Thomas on the other hand;

(4) All Communications between any JCPS Personnel about, or including reference to, (a) Danielle Thomas or (b) Christine Thomas;

(5) All Documents reflecting any treatment for Danielle Thomas at any counseling, medical, mental health facility at JCPS;

(6) All Documents reflecting any treatment for Danielle Thomas for any counseling, medical, or mental health services at JCPS;

(7) Any Documents or Communications relating to misconduct allegations alleged by Danielle Thomas or Christine Thomas against any person;

(8) Any Documents relating to misconduct allegations against Danielle Thomas by any person; and

(9) Any Documents relating to Danielle Thomas's accommodation request(s).

3. On November 15, 2023, a subpoena duces tecum on non-party Garfield County School District 16 ("GCSD Subpoena"), ECF No. 72-1, the school district where Mr. Miller attended high school, which seeks four categories of documents:

(1) All transcripts for Tyler Miller;

(2) All Communications relating to Tyler Miller's grades;

(3) All Communications between any GCSD Personnel and Tyler Miller related to his discipline, misconduct, any acts of violence by anyone, any reports by Tyler Miller to GCSD of misconduct or violence by anyone else; and

(4) Any Documents relating to allegations against Tyler Miller by any person.

4. On November 16, 2023, a subpoena duces tecum on non-party Examination Resources, LLC ("Examination Resources Subpoena"), ECF No. 74-1, the entity which employs Christine Thomas, which seeks seven categories of documents:

(1) Any resume, job application, and statement of interest for Christine Thomas;

(2) For the past five years, any Documents sufficient to explain the job description for any position that Christine Thomas has held with your organization;

(3) For the past five years, any Documents that describe or calculate the dates during the course of her employment that Christine Thomas worked or did not work, including any dates missed from work, whether for sickness, vacation, personal leave, or similar reasons;

(4) For the past five years, any Documents that reflect the name and contact information of Christine Thomas's direct supervisor;

(5) For the past five years, any Documents that relate or pertain to insurance policies that provide coverage or benefits for Christine Thomas, her children or family, including for Plaintiff Danielle Thomas;

(6) Any Documents reflecting insurance claims made for medical or mental health benefits to be paid on behalf of Plaintiff Danielle Thomas; and

(7) For the past five years, any other Documents that reference or relate to Plaintiff Danielle Thomas.

Each of the subpoenas is the subject of a motion to quash. Danielle Thomas and Mr. Miller have moved to quash the DU Subpoena. ECF No. 67 (Miller); ECF No. 68 (Danielle Thomas). Danielle Thomas and Mr. Miller also seek to quash the JCPS and GCSD Subpoenas. ECF No. 69 (Danielle Thomas); ECF No. 72 (Miller). Christine Thomas, Danielle's mother, has moved to quash the subpoena issued to her employer, Examination Resources. ECF No. 74. In lieu of additional formal briefing on the Motions, the court utilized its informal discovery dispute procedures, allowing the parties to submit, informally and directly to Chambers, extensive written materials concerning their positions on the Motions. In addition, the court heard extensive oral argument on the question of the propriety of the subpoenas. *See* ECF No. 78 (December 7, 2023 Courtroom Minutes).

Being fully advised as to each party's position, the court addresses each of their arguments here and issues an order addressing every component of each subpoena.

## ANALYSIS

### I.      Motions to Quash

#### A.      Legal Standards

The legal framework guiding the court's analysis begins with Federal Rule of Civil Procedure 45, which directs that this court "must quash or modify a subpoena that . . . requires disclosure of privileged or other protected matter, if no exception or waiver applies; or . . . subjects a person to undue burden." Fed. R. Civ. P. 45(d)(3)(A), (iii), (iv). *See also Cobbler Nevada, LLC v. Does*, No. 15-cv-02771-WYD-MEH, 2016 WL 300827, at *1 (D. Colo. Jan. 25, 2016) ("Objections unrelated to a claim of privilege or privacy interests are not proper bases upon which a party may quash a subpoena.") (citations omitted).[3] "The movant bears the burden of persuasion in a motion to quash a subpoena." *See, e.g.*, *Bales v. Quest USA Corp.*, No. 18-mc-00222-RM, 2019 WL 1454696, at *1 (D. Colo. Apr. 2, 2019); *Cuomo v. N.Y. State Assembly Judiciary Comm.*, 683 F. Supp. 3d 258, 268 (E.D.N.Y. 2023), *recon. denied sub nom. Cuomo v. Off. of the N.Y. State Att'y Gen.*, No. 22-MC-3044 (LDH) (TAM), 2024 WL 1345529 (E.D.N.Y. Mar. 29, 2024); *S.E.C. v. Goldstone*, 301 F.R.D. 593, 646 (D.N.M. 2014) (noting the party moving to quash a subpoena has the burden to demonstrate good cause and/or a privilege to be protected). "A party seeking to quash a subpoena duces tecum has a particularly heavy burden as contrasted to a party seeking only limited protection." *In re Coordinated Pretrial Proceedings in*

---

[3] Mr. Ackermann does not argue that any party lacks standing to move to quash the subpoenas, nor can this court discern any basis to challenge standing in light of the privacy concerns each objector has raised. *See Windsor v. Martindale*, 175 F.R.D. 665, 668 (D. Colo. 1997) ("a party has no standing to quash a subpoena served upon a third party, except as to claims of privilege relating to the documents being sought" or "upon a showing that there is a privacy interest applicable").

*Petroleum Prod. Antitrust Litig.*, 669 F.2d 620, 623 (10th Cir. 1982). The objecting party must submit "a particular and specific demonstration of fact, as distinguished from stereotyped and conclusory statements." *Gulf Oil Co. v. Bernard*, 452 U.S. 89, 102 n.16 (1981) (internal quotation marks and citations omitted).

The court also takes into account that "a subpoena is bound by the same [Federal Rule of Civil Procedure 26(b)] standards that govern discovery between the parties, and, to be enforceable, a subpoena must seek information that is relevant to a party's claims or defenses and proportional to the needs of the case." *Oransky v. Martin Marietta Materials, Inc.*, No. 18-cv-00266-MSK-NRN, 2018 WL 11514384, at *1 (D. Colo. Sept. 7, 2018); *see also, e.g.*, *GSL Grp. Inc. v. Travelers Indem. Co.*, No. 18-cv-00746-MSK-SKC, 2020 WL 12813087, at *2 (D. Colo. May 27, 2020) ("[T]he scope of discovery under a subpoena is the same as the scope of discovery under Rule 26(b).") (citing 9A Wright & Miller, *Federal Practice and Procedure* § 2452 (3d ed. 2008)). In assessing proportionality, the court considers "the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(1). As to relevance, "[r]elevance is broadly construed, and a request for discovery should be considered relevant if there is any possibility that the information sought may be relevant to the claim or defense of any party." *Carlson v. Colorado Ctr. for Reprod. Med.*, *LLC*, 341 F.R.D. 266, 277 (D. Colo. 2022) (quotations omitted). "The party seeking production has the initial burden of showing relevance." *Id.* As also pertinent here:

> On motion or on its own, the court must limit the frequency or extent of discovery otherwise allowed by these rules or by local rule if it determines that:

(i) the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive;

(ii) the party seeking discovery has had ample opportunity to obtain the information by discovery in the action; or

(iii) the proposed discovery is outside the scope permitted by Rule 26(b)(1).

Rule 26(b)(2)(C).

Finally, the court's decision on a motion to quash, as with any discovery ruling, is "within the broad discretion of the trial court, and [the Court of Appeals] will not disturb [it] absent a definite and firm conviction that the lower court made a clear error of judgment or exceeded the bounds of permissible choice in the circumstances." *Kenno v. Colo. Governor's Off. of Info. Tech.*, Nos. 21-1353 & 21-1434, 2023 WL 2967692, at *7 (10th Cir. Apr. 17, 2023) (internal quotation marks omitted) (quoting *Cole v. Ruidoso Mun. Sch.*, 43 F.3d 1373, 1386 (10th Cir. 1994)), *cert. den'd*, 144 S. Ct. 696 (2024); *Prisbrey v. State Auto Ins. Cos.*, No. 4:21-cv-124, 2023 WL 4745106, at *2 (D. Utah July 25, 2023) ("motions to quash are left to the discretion of the court"); *see also S.E.C. v. Merrill Scott & Assocs., Ltd.*, 600 F.3d 1262, 1271 (10th Cir. 2010) (discovery rulings are reviewed for abuse of discretion).

With these legal principles in mind, the court evaluates each Motion to Quash.

**B.     DU Subpoena**

The court will separately address the arguments of Ms. Thomas and Mr. Miller for quashing the DU Subpoena, beginning with those put forward by Ms. Thomas.

**1.     Danielle Thomas**

Ms. Thomas moves to quash the DU Subpoena on grounds that it seeks information that is confidential and, in some instances, irrelevant. *See generally* ECF No. 68. To be sure, under

the Family Educational Rights and Privacy Act of 1974 ("FERPA"), 20 U.S.C. § 1232g, Ms. Thomas has a right of privacy in her education records. Practically speaking, however, this means those records can be disclosed pursuant to a lawfully-issued subpoena or court order, as the statute makes clear. *Id.* § 1232g(b)(2)(B). Nevertheless, some courts have recognized that the congressional policy expressed in FERPA "places a significantly heavier burden on a party seeking access to student records to justify disclosure than exists with respect to discovery of other kinds of information, such as business records." *Doe v. Yale Univ.*, 564 F. Supp. 3d 11, 20 (D. Conn. 2021) (quoting *Rios v. Read*, 73 F.R.D. 589, 598-99 (E.D.N.Y. 1977)). *Accord*, *e.g.*, *In Re Abubakar*, --- F. Supp. 3d ---, 2023 WL 6392307, at *14 (N.D. Ill. Sept. 30, 2023); *Alig-Mielcarek v. Jackson*, 286 F.R.D. 521, 528 (N.D. Ga. 2012).

The court thus proceeds to analyze relevance and proportionality with respect to each category of documents sought in the DU Subpoena.

***Request #1: All DU transcripts*.** Ms. Thomas has represented to the court that she has provided her DU transcripts and has "offered to voluntarily provide by supplemental disclosure a more updated copy of her DU transcripts, but such proposal was declined by the defense." ECF No. 68 at 7. In light of Mr. Ackermann's decision to decline counsel's good-faith offer to resolve this dispute short of a court order, which is in contravention of the spirit of this court's discovery dispute procedures, the court **GRANTS** the motion to quash the DU Subpoena insofar as it seeks Ms. Thomas's complete transcripts for her DU academic career to date. The court further directs that, **within fourteen days of the date of this order, counsel for Ms. Thomas shall provide to counsel for Mr. Ackermann (with copies to other counsel) a certified copied of her most current DU transcript**, reflecting all grades she has earned to date, including those for any

study-abroad program in which she has participated during her tenure at DU.

      ***Request #2: All communications related to Ms. Thomas's grades.*** The impetus for this request appears to stem from a series of emails, sent to or received from DU officials by Danielle and/or Christine Thomas, and produced to Mr. Ackermann in discovery.[4] Those emails request alterations of Danielle Thomas's grades in at least one course—while describing her as a student who aspires to attend medical school and who achieved a 4.8 grade point average in her high school International Baccalaureate Program—because of the trauma she allegedly suffered in connection with the March 2022 incident.

      While Ms. Thomas seems to contend that this request seeks information that is entirely irrelevant and should be quashed on that basis alone, *see* ECF No. 68 at 8, the court respectfully disagrees.[5] As evidenced in even the limited group of emails reviewed by the court, communications discussing the supposed degeneration of Ms. Thomas's grades reasonably may reveal highly relevant information—in particular, information concerning her allegedly intense physical and emotional suffering caused by the incident on which her claims for non-economic damages hinge. Too, the emails the court has seen indicate that specific descriptions of the incident (by either Ms. Thomas or her mother) may be contained in emails concerning Ms.

---

[4] The court reviewed emails submitted by Mr. Ackermann in connection with the hearing on the Motions. The court discusses the content of those emails as pertinent to its assessment of the Motions to Quash.

[5] Notably, it came to light during oral argument that counsel for Ms. Thomas had subpoenaed some documents concerning Mr. Ackermann from DU—with no objection from Mr. Ackermann. The court was not informed of the precise scope of that subpoena, but observes that the force of Ms. Thomas's blanket objection to Category #2 is undermined by her subpoenaing some of Mr. Ackermann's educational records.

Thomas's grades.[6] Such information also readily falls within the expansive definition of relevance. *See Carlson*, 341 F.R.D. at 277 (request is relevant if there is "any possibility that the information sought may be relevant to the claim or defense of any party") (emphasis added).

The decision regarding relevance, however, does not end the matter. The court also must evaluate the question of proportionality. *See Oransky*, 2018 WL 11514384, at *1. With regard to that issue, the court finds that Request #2, as submitted by Mr. Ackermann, is overbroad and that compelling the University to provide a complete response would impose an undue burden.

Mr. Ackermann seeks "*all* communications *relating to*" Ms. Thomas's grades, a request which, on its face, admits of no plausible limits. Would "communications," for example, include a note jotted down by a professor or administrator following a telephone call with Ms. Thomas or her mother? Or, as Ms. Thomas asks, would a handwritten note by a professor on a test paper count as a communication "relating to" a grade? Logically, it would seem so. Moreover, the request is unbounded in terms of persons or timeframe—in essence, it demands a search of all forms of communications of virtually every DU official who may ever have had contact with Ms. Thomas (or her mother).

The parties having failed to come to an agreement on any component of this request following conferral, the court is left to balance the competing considerations of Mr. Ackermann's entitlement to relevant discovery about the alleged impact of the incident on Ms.

---

[6] For example, the court reviewed an email dated June 14, 2022, from Christine Thomas to various DU personnel entitled "Please assist – Danielle Thomas Fw: General Chemistry Laboratory Grade (Autumn Quarter)," which stated: "It's not clear despite the text threats to Danielle's life in addition to being beaten with a lacrosse stick, that DU is going to take any action to remove this dangerous student from campus." CTHOMAS_000057.

Thomas with the need to appropriately circumscribe Mr. Ackermann's sweeping request and eliminate an undue burden on the University. *See Witt v. GC Servs. Ltd. P'ship*, 307 F.R.D. 554, 569 (D. Colo. 2014) (noting that discovery must be bounded by principles of "proportionality, reasonableness, convenience, and common sense"). To that end, the court directs as follows:

*First*, Request #2 is limited to **email** communications.

*Second*, the timeframe for the search of such emails is **March 3, 2022 (the date of the incident) through the date of this order** (in light of Ms. Thomas's continuing attendance at the University).

*Third*, the custodians whose emails are to be searched include those persons named on the email chains reviewed by the court and who are reasonably likely to be parties to email communications concerning Danielle Thomas's grades:

>Janet Burkhardt
>Kristine McCaslin
>Tonnett Luedtke
>Todd Wells
>Tyler Ball
>Hannah Higgins
>Olivia Feldkamp
>Anahit Peyfoon
>Niki Latino
>Todd C. Adams
>Office of the Chancellor
>Catherine Wharton
>Stephani Potthoff

**In addition, to the extent they have not already done so, within fourteen days of the date of this order, Danielle Thomas <u>and</u> Christine Thomas shall provide to all counsel of record in this matter a list of any other DU personnel, not referenced in the foregoing list,**

with whom they communicated by email about Danielle Thomas's grades during the period between March 3, 2022, and the date of this order. The court further orders that any such additional personnel be included on the foregoing list of persons whose emails are to be searched and that those additional names be conveyed, along with this order on Ms. Thomas's Motion to Quash, to the University of Denver.

*Finally*, no party has proposed search terms, and so the court is obliged to do so. Bearing in mind the guideposts of relevance and proportionality, the court directs that the following terms be searched in accordance within the previously-identified limitations on custodians and timeframe:

> Danielle Thomas
> Christine Thomas
> Dani Thomas

While this search may encompass some emails beyond the particular category of grades, the record before the court strongly suggests that Ms. Thomas's academic coursework will be a key focus of communications within the timeframe and custodian subgroup defined above.

In sum, consistent with these parameters, Ms. Thomas's Motion to Quash with respect to Request #2 is **GRANTED in part and DENIED in part**.

**Request #3: All communications between DU personnel and Danielle Thomas or Christine Thomas or Tyler Miller.** This request, demanding "all communications" between *any* DU personnel and either Ms. Thomas or Christine Thomas or Tyler Miller, with no defined timeframe, is untethered to any claims or defenses asserted in this case. Therefore, the court cannot conclude that the request seeks relevant information. Neither is there any attempt to cabin the request in a proportional manner. If authorized, this request would have the University search

13

the email accounts of every DU employee to ascertain whether that person may have exchanged an email with either Danielle Thomas, Christine Thomas, or Mr. Miller, on any topic at all and at any point in time. This is the very epitome of overbroad and scattershot discovery that may justly be characterized as an unwarranted fishing expedition. *See Eaves Colo. Dep't of Corr.*, No. 18-cv-02619-CMA, 2019 WL 8953461, at *12 (D. Colo. Nov. 5, 2019) ("Before issuing a subpoena to a third party, the court must find, among other requirements, that the request to issue the subpoena is made in good faith and is not intended as a general fishing expedition.") (citing *People v. Spykstra*, 234 P.3d 662, 669 (Colo. 2010)).

Therefore, Ms. Thomas's Motion to Quash with respect to Request #3 is **GRANTED**.

***Request #4: All communications between any DU Personnel referencing Danielle Thomas, Christine Thomas, or Tyler Miller.*** Equally unconstrained by the doctrines of relevance and proportionality is the information sought in Request #4: "All Communications between any DU Personnel about, or including reference to, (a) Danielle Thomas, (b) Christine Thomas, or (c) Tyler Miller." Here, again, Mr. Ackermann would have the University search the email accounts of every DU employee for the mere mention of one of these individuals, no matter the topic and no matter the timeframe. This, too, is another inappropriate fishing expedition, and the court declines to recraft the request for Mr. Ackermann to bring it within the range of relevance and proportionality.

Ms. Thomas's Motion to Quash with respect to Request #4 is **GRANTED**.

***Requests #5 and #6: Documents reflecting medical and mental health treatment for Danielle Thomas.*** In these requests, Mr. Ackermann seeks all records for treatment that Ms.

Thomas has obtained at DU.[7] Ms. Thomas does "not oppose any production as to medical treatment or mental health treatment services at DU or a DU facility, so long as the Court limits and narrows such requests to only documents related to any such services arising from Ackermann's assault." ECF No. 68 at 9.[8] At the discovery hearing, Mr. Ackermann's counsel acknowledged that certain medical information (a well-woman medical visit, for example) may not be relevant, but it is not necessarily the case that information concerning Ms. Thomas's mental health would not be contained in records generated by general medical providers. Ms. Thomas argues that, with respect to records generated by general medical providers, she retains a treater-patient privilege pursuant to Colo. Rev. Stat. § 13-90-107(1)(d) (2022).[9] *Id.*

Privileges in this diversity case are governed by the state law of the forum. *Motley v. Marathon Oil Co.*, 71 F.3d 1547, 1551 (10th Cir. 1995) (citing Fed. R. Evid. 501; *White v. American Airlines, Inc.*, 915 F.2d 1414, 1424 (10th Cir. 1990)). Under Colorado law,

> [a] physician, surgeon, or registered professional nurse duly authorized to practice his or her profession pursuant to the laws of this state or any other state shall not be examined without the consent of his or her patient as to any information acquired

---

[7] The requests are identical except for a reference to a "facility at DU" and "services at DU" in another. The court assumes this distinction is purposeful and intends to capture records of DU personnel (say, a student counselor) who may work with students outside a formal clinical setting.

[8] Plaintiff has since made plain that she has no mental health records at DU. ECF No. 120 at 1. The court cannot compel DU to produce documents that do not exist. Accordingly, Requests #5 and #6 are quashed to the extent they seek mental health records.

[9] Ms. Thomas's motion to quash references § 13-90-107(1)(c), which applies to members of the clergy, ECF No. 68 at 9, but the court understands her claim of privilege to rely on § 13-90-107(1)(d), which establishes a privilege with respect to treatment received from a physician, surgeon, or registered professional nurse. In addition, if Ms. Thomas had not in the meanwhile made plain that she has no mental health records at DU (ECF No. 120 at 1), the privilege established in § 13-90-107(1)(g), governing interactions with licensed psychologists, professional counselors, and social workers, would also apply here.

in attending the patient that was necessary to enable him or her to prescribe or act
for the patient.

Colo. Rev. Stat. § 13-90-107(d). This privilege applies "equally to in-court testimony and to
pretrial discovery of information." *Weil v. Dillon Cos., Inc.*, 109 P.3d 127, 129 (Colo. 2005).
"Taken together, C.R.C.P. 26(b)(1) and section 13-90-107(d) establish that, even if relevant to
the subject matter involved in the pending action, a party is not necessarily entitled to discovery
of information from a physician relating to the treatment of a patient." *Alcon v. Spicer*, 113 P.3d
735, 738 (Colo. 2005). The purpose of the privilege is to protect a patient's ability to be candid
with her physician and to secure the medical treatment necessary without the embarrassment or
humiliation disclosure might cause. *Id.* at 738; *see also Cardenas v. Jerath*, 180 P.3d 415, 424
(Colo. 2008).

However, the physician-patient privilege is not absolute and can be waived, either
expressly or impliedly. "[P]rivilege holders inject their physical or mental condition into a case
as the basis of a claim when they utilize the condition as the predicate for some form of judicial
relief." *Gadeco, LLC v. Grynberg*, 415 P.3d 323, 326 (Colo. 2018) (internal quotations omitted).
Thus, when a party has put a particular physical or mental condition at issue by claiming an
injury and damages for that injury, she has "waived her physician-patient privilege as to the
treatment related to such conditions, but maintains the privilege for medical records wholly
unrelated to her injuries and damages claimed." *Carlson*, 341 F.R.D. at 281 (citing *Alcon*, 113
P.3d at 739; *Cardenas*, 180 P.3d at 424 ("This waiver does not amount to a general disclosure of
the patient's entire medical history, but rather is limited to the cause and extent of the injuries
and damages claimed.")). And so "'relevance alone cannot be the test' for waiver of the

16

physician-patient privilege." *Alcon*, 113 P.3d at 741 (quoting *Weil*, 109 P.3d at 131).

Here, Ms. Thomas claims hundreds of thousands of dollars of damages from physical and mental pain and suffering, and future damages as to her mental health as a result of Mr. Ackermann's alleged conduct. She specifically seeks "past and future such damages relative to physical and mental pain and suffering, impairment of quality of life, emotion[al] stress and inconvenience[.]" ECF No. 56 at 4. Moreover, she claims damages for these alleged physical and emotional injuries of up to $400,000.00. *Id.*; ECF No. 120-1 at 3 (current categories of alleged damages); *see also* 6/16/2022 email from Christine Thomas to Hannah Higgins, CTHOMAS_000062 (assertions concerning "Danielle's lack of executive functioning" and her having "ptsd"). On the economic damages front, Ms. Thomas seeks $7,000.00 "for trauma-related counseling fees through April 2023," with additional counseling fees accumulating at a rate of "$140.00 per month thereafter." ECF No. 56 at 4.[10]

As these numbers demonstrate, the alleged physical and emotional injuries sustained by Ms. Thomas comprise the overwhelming majority of her claim for damages and, in fact, may properly be described as the very essence of her suit against Mr. Ackermann. Stripping the action of non-economic damages, this case would be of little monetary value and certainly would not have satisfied the monetary jurisdictional requirement of 28 U.S.C. § 1332(a). And, as Ms. Thomas's own disclosure of her damages acknowledges, the hundreds of thousands of dollars of non-economic damages she demands do not break out which portion she ascribes to her

---

[10] Ms. Thomas claims a small amount of other economic damages, including lost wages for the summer of 2022, as well as certain attorney's fees incurred in separate litigation, ECF No. 56 at 4 and ECF No. 86 (Am. Complt.), but the crux of her damages demand is her claimed entitlement to noneconomic damages.

purported physical pain and suffering at the time, versus mental pain and suffering at the time, versus ongoing "impairment of [the] quality of life emotion[al] stress and inconvenience" stemming from the March 2022 incident. ECF No. 120-1 at 3. To prove those damages, she must come forward with specifics concerning the alleged harm to her physical and emotional well-being, and Mr. Ackermann is entitled to suss out the veracity of those claims by pointing to such matters as a lack of treatment or alternative reasons for any physical or mental condition—to take but two examples of highly relevant information that may be derived from the DU records sought in Requests 5 and 6.

Therefore, the court finds that Ms. Thomas has squarely placed both the physical and mental aspects of her medical condition at issue in this action, and that she has waived the physician/nurse-patient and counselor-patient privileges with respect to her DU treatment records. *See Steven Blanco, Sr. v. HCA-Healthone, LLC*, No. 19-cv-00928-PAB-SKC, 2021 WL 351252, at *1 (D. Colo. Feb. 2, 2021) ("Thus, Plaintiffs have waived any physician-patient privilege or privacy rights related to the autopsy or the cause of death by placing those matters squarely at issue in this litigation."); *Adams v. Womble*, No. 14-cv-01431-RM-NYW, 2016 WL 11692349, at *2 (D. Colo. June 28, 2016) ("Because Ms. Adams contends that her injuries and the resulting damages were caused by Dr. Womble's surgery and his negligence . . . the court finds that Ms. Adams has waived any physician-patient privilege with the medical treatment providers who provided Ms. Adams care and consulted with Dr. Womble . . ."). In light of Ms. Thomas's broad claims of mental impairment, along with other undefined mental and physical injuries, the court will not cabin Requests 5 and 6 exclusively to mental health treatment records following the March 2022 incident. In finding that the requests seek relevant information, the

court includes the approximately six months of DU records that predate the March 2022 incident (starting with Ms. Thomas's matriculation at DU), which may provide relevant context for assessing whether Ms. Thomas's claims of physical and emotional injury may be attributable to other conditions or sources.[11]

The court also finds that Requests #5 and #6 are proportional to the needs of the case **insofar as they request her treatment records only**.[12] While Ms. Thomas does not expressly address proportionality, the court finds, for the reasons set forth above, that the discovery sought is important to the issues at stake in the action—particularly because Ms. Thomas's large damages demand is based almost exclusively on a purported causal connection between the March 2022 incident and the alleged compromise to her physical and emotional health. Obviously, in light of Ms. Thomas's resistance to producing her DU medical records, Mr. Ackermann cannot obtain this relevant information by any other means. Ms. Thomas's medical records are unquestionably sensitive, but she has placed both her physical and mental health directly at issue in this matter and has made those conditions the centerpiece of her demand for damages. And the court finds that, at the discovery phase, the sensitivity of this information may be properly addressed by designating Ms. Thomas's medical records as "confidential" pursuant to the protective order in this case. *See* ECF No. 65. Further, the court directs the parties to

---

[11] The court notes, for example, a reference in the record to Ms. Thomas having suffered from an undefined illness during her first quarter at the University, before the alleged assault in the second quarter. *See* 1/3/2022 email from Danielle Thomas to Todd Wells, CTHOMAS_000058 (statement by Danielle Thomas that she was "extremely ill" in the autumn quarter).

[12] To the extent "all documents" may encompass other documents (including emails), the court finds that it is not proportional to the needs of the case to require the University to search for potentially responsive documents beyond Ms. Thomas's formal treatment records.

safeguard and respectfully handle this sensitive medical information under the Stipulated

Protective Order (which permits use or disclosure only pursuant to its several terms, and only for

purposes of preparing and trying this case)—especially any such information that ultimately may

be determined to be of less significance to Ms. Thomas's damages claims in this action. In

particular, the court cautions that the persons authorized under the Protective Order to access

Confidential information shall access Ms. Thomas's treatment records *only to the extent

necessary* to assist their counsel in preparing this case.[13]

For these reasons, Ms. Thomas's Motion to Quash with regard to Requests #5 and #6 is

**DENIED** insofar as it seeks Ms. Thomas's medical treatment records at the University of

Denver and **GRANTED** only to the extent of mental health records, as Ms. Thomas has none at

DU. The timeframe for the production is Ms. Thomas's entire tenure at DU, including the period

prior to the incident in March 2022 and extending through the present.

*Request #7: Information regarding Ms. Thomas's roommates at DU.* Ms. Thomas

states that she "does not oppose production of a document by DU" providing "[t]he name,

permanent home address, and telephone number of any student who was assigned to reside in

any dormitory room with Danielle Thomas during the 2021-2022 academic year at DU." ECF

No. 68 at 10. The court thus understands this request not to be the subject of the motion to quash,

and therefore issues no ruling regarding Request #7.

*Request #8: All documents relating to Danielle Thomas's DU "accommodation"

requests.* As with the communications related to Ms. Thomas's grades addressed in connection

---

[13] If any other party produces medical or psychological records in this case, the same is true of
those records as well.

with the court's analysis of Request #2, above, the group of emails provided to the court indicate that Ms. Thomas has sought accommodations, as that term is commonly understood,[14] subsequent to the March 2022 incident. Those emails reflect that, either directly or through her mother, Ms. Thomas has sought adjustments of grades and asked that a late fee be waived. This court is unaware of any other requests for "accommodation"—understood in its ordinary sense— that Ms. Thomas may have requested, nor has Mr. Ackermann identified any such requests in his discovery papers. Neither would the court expect the University to have a ready means of tracking such requests.

With this information in mind, the court finds, first, that documents reflecting requests for accommodations tied to the incident, whether requested by Ms. Thomas or her mother, are relevant. A March 24, 2022 email is indicative of the possible information to be gleaned from such "accommodation" requests. *See* CTHOMAS_000029. In that email, Christine Thomas asked a DU official for a waiver "of late fees and accommodation," and described her daughter as "having nightmares and panic attacks" and as being harassed by "the other student[']s [presumably, Mr. Ackermann's] high cost private investigator." *See id.* Communications of this type plainly bear on Ms. Thomas's claims for emotional and physical injury and, possibly, economic damages. However, with regard to the proportionality inquiry, the court finds a lack of proportionality—and a concomitant undue burden on the University—in Mr. Ackermann's sweeping request for "all documents relating to" such accommodation requests, for the same reasons discussed above in connection with Request #2 ("all communications relating to" Ms.

---

[14] Ms. Thomas has not brought a disability-discrimination claim against the University in this matter, and the court is unaware of any such pending case.

Thomas's grades).

Accordingly, in recognition of the clear relevance of information concerning requests for accommodations following the March 2022 incident, and with due regard for considerations of proportionality, the court takes a twofold approach to Request #8:

*First*, with regard to **communications** concerning accommodations, the court directs that such communications be produced, in accordance with the parameters identified in connection with Request #2, above (i.e., emails only, timeframe, custodians, and search terms). Based on the information before the court, it reasonably anticipates that any discussion of accommodations will be encompassed by emails that comply with those parameters. The court further directs that if **Danielle Thomas and/or Christine Thomas have communicated by email concerning accommodations with any other DU personnel during the period between March 3, 2022, and the date of this order, they must provide those names to all counsel of record within fourteen days of the date of this order. The court further orders that any such additional personnel be included on the list of persons whose emails are to be searched and that those additional names be conveyed to the University of Denver, along with this order.**

*Second*, the court finds that **documents** requesting an accommodation for Danielle Thomas pursuant to the Rehabilitation Act of 1973 or the Americans with Disabilities Act of 1990, as amended by the ADA Amendment Act of 2008—if any such documents exist—are both relevant and proportional to the needs of the case. These, too, shall be produced by the University in response to the DU Subpoena.

Finally, any other documents that may, in some marginal sense, "relate to" a request for accommodations have not been identified in the parties' briefing and are unknown to this court.

The court declines to speculate about these theoretical documents and to order the University of Denver to embark on a wild goose chase to find them.

Therefore, consistent with the parameters articulated above, Ms. Thomas's Motion to Quash as to Request #8 is **GRANTED in part and DENIED in part**.

### Request #9: All documents regarding Ms. Thomas's requests to study abroad.

Like many college students, Ms. Thomas spent the autumn 2023 quarter in a study-abroad program in Italy. Request #9 demands that the University produce "[a]ll Documents relating to" Ms. Thomas's request to study abroad. Such documents, per Mr. Ackermann, include (but are not limited to), Ms. Thomas's "application materials, the program, and Documents approving" Ms. Thomas's request to participate in the program. Mr. Ackermann claims that these documents are relevant because they may indicate something about Ms. Thomas's physical and mental state, demonstrating (or not) her ability to function independently in a foreign country—notwithstanding her claims of compromise to her physical and mental health. The court finds that, even if Request #9 might yield marginally relevant information, it is not proportional to the needs of the case.

A measure of moderation and perspective must be brought to bear on the question. *See Witt*, 307 F.R.D. at 569 (discovery informed by principles of "proportionality, reasonableness, convenience, and common sense"); *see also Saleh v. Pfister*, No. 18 C 1812, 2021 WL 326361, at *3 (N.D. Ill. Feb. 1, 2021) ("Proportionality, like other concepts, requires a common sense and experiential assessment."). This case turns on the veracity of Ms. Thomas's accusation that Mr. Ackermann assaulted her in a college dorm room in March 2022, a year and a half before she commenced her study-abroad program. In bringing forward this accusation, Ms. Thomas has not

23

consigned every aspect of her life to the defendant's scrutiny. Her decision to pursue a study-abroad program—and the specifics of her application for that program—are not issues of importance in resolving the integral questions here: whose account of the March 2022 incident is true and, if Ms. Thomas's, what damages has she sustained as a result. To the extent Mr. Ackermann's theory is that Ms. Thomas's success in managing her life in a foreign country demonstrates her resilience and positive mental health status, he does not need her application papers to make that argument to the jury; there is no dispute that Ms. Thomas completed a semester of study in Italy.

Moreover, the court observes that Mr. Ackermann has other means of obtaining the substance of the information he seeks from the University in this request. Ms. Thomas was deposed for some eleven hours, affording counsel an opportunity to question her at length about her study-abroad semester, including why she decided to pursue the program, how she handled the experience, how she paid for it (a question counsel also might ask Christine Thomas), and any other subtopic deemed relevant by Mr. Ackermann. In addition, Mr. Ackermann will have access to the grades Ms. Thomas earned in the program, and he can draw what inferences he will from that information and attempt to persuade the jury to adopt his point of view.

In sum, the court finds that Request #9 seeks information so far removed from the incident in Mr. Ackermann's dorm room in March 2022 as to render its production disproportionate to the needs of the case. The court declines to burden the University, and to open the door to an unrelated aspect of Ms. Thomas's life, by mandating the production of information of such attenuated significance in this matter. The court therefore **GRANTS** Ms. Thomas's Motion to Quash with respect to Request #9.

***Request #10: All documents relating to financial aid for Ms. Thomas***. Similar in nature to Request #9, Request #10 seeks information with no clear constraints and no apparent connection to the March 2022 dorm room incident: "All Documents relating to any form of financial aid and/or scholarships that Danielle Thomas . . . received for any DU enrollment period or program." This "relating to" request, according to Mr. Ackermann, goes to his counterclaims against Danielle and Christine Thomas and Mr. Miller. He argues that Ms. Thomas's financial aid is relevant because if she "received greater 'merit-based' scholarships after the alleged incident, it would present a powerful pecuniary motive" for Ms. Thomas, her mother, and Mr. Miller "to craft and maintain their false narrative against Mr. Ackermann." 12/4/2023 Ackermann Discovery Statement at 9.[15]

The court appreciates the breadth of relevant discovery, but it likewise is obliged to protect litigants from mere fishing expeditions. *Cuomo v. Clearing House Ass'n, LLC*, 557 U.S. 519, 531 (2009) ("Judges are trusted to prevent 'fishing expeditions' or an undirected rummaging through . . . records for evidence of some unknown wrongdoing."); *see also Eaves*, 2019 WL 8953461, at *12 (court must guard against "general fishing expedition[s]"). Respectfully, the gap between the dorm-room incident in March 2022 and the content of Ms. Thomas's DU financial aid materials is so wide as to place Request #10 in the fishing-expedition category. The court recognizes that there are emails indicating that, on one occasion, Christine Thomas asked for a late-fee waiver in the immediate aftermath of the incident, but that fact does not compel the conclusion that details concerning the Thomas family's overall financial status—

---

[15] Pursuant to this court's discovery dispute procedures, the parties submitted discovery statements. Discovery statements are not made part of the formal docket.

such as the income earned by Ms. Thomas's parents, the amount of their pensions and IRA deductions, and other sensitive financial information that would be encompassed within "all documents relating to financial aid"[16]—is subject to scrutiny in this litigation. In this action, Ms. Thomas primarily seeks noneconomic damages for the alleged detriment to her physical and mental health; she does not claim economic damages for any supposed degradation of her family's financial condition attendant on the March 2022 incident. That is why this court has declined to quash the subpoena for her medical and mental health treatment records. *See* Requests #5 and #6, above. Details concerning Ms. Thomas's family's financial information, however, lack a similar connection to her requested damages.

The court recognizes Mr. Ackermann's "pecuniary motive" theory—if more scholarships, then a greater motive to lie about him, *see* Ackermann Discovery Statement at 9— but his conclusion does not logically follow from his premise. The amount of Ms. Thomas's merit scholarships (if any) may increase or decrease for reasons entirely unrelated to her claim that she was assaulted by Mr. Ackermann. Tying the content of Ms. Thomas's DU financial-aid package to her report about the incident in March 2022 is a very large leap indeed. Given the marginal (at best) relevance of this information, the court declines to expose the many levels of sensitive personal financial data likely contained in Ms. Thomas's DU financial-aid records and to set off the litigation play-within-a-play that the production of these financial records are certain to prompt. Put simply, the request is wholly disproportional to the needs of the case.

For these reasons, the court **GRANTS** Ms. Thomas's Motion to Quash with respect to

---

[16] *See* <u>Free Application for Federal Student Aid (FAFSA) Form, July 1, 2024 - June 30, 2025</u>, last visited May 8, 2024.

Request #10.

### 2.   Tyler Miller

Requests #1, #2, #3, #4, #9, and #10 in the DU Subpoena also seek information concerning Tyler Miller, who Mr. Ackermann has named as a third-party defendant. Recall that Mr. Miller was Ms. Thomas's boyfriend, and Mr. Ackermann's roommate, at the time of the March 2022 incident. In moving to quash those aspects of the DU Subpoena directed to him, Mr. Miller urges that the targeted information is irrelevant and disproportional to the needs of the case, and also confidential and/or protected by FERPA. *See generally* ECF No. 67. For context, Mr. Miller indisputably was aware of the March 2022 incident. He testified at a misconduct hearing that apparently led to Mr. Ackermann's removal from the University. Ackermann Discovery Statement at 7. After the incident, Mr. Miller also "asked for protection from Mr. Ackermann," including to be moved to a different dormitory room. In Mr. Ackermann's view, though, Mr. Miller's statements to DU officials were "false and defamatory statements[.]" *Id.* But the latter point simply reflects Mr. Ackermann's disagreement with Mr. Miller's perspective on what had transpired, and its impact on Ms. Thomas and on his own personal safety.[17]

The court is unpersuaded that a student who exercises his right to express his view of an incident—particularly one that he believes implicates his safety—opens the student's entire University record to the scrutiny of the accused person in the context of civil litigation. The

---

[17] The court observes that Mr. Ackermann himself may have viewed the incident somewhat differently at the time. *See* ECF No. 68-1, 3/10/2022 email from Ackermann to Kristine McCaslin, ECF No. 68-1 (stating that "[t]wo close friends have placed a restraining order on me after a night in which I was intoxicated and do not remember," and that "I'm freaking out that I hurt the people close to me without knowing and without having the ability to say sorry. I don't know what to do and scared I'll never have a chance to explain myself and apologize.").

court's assessment is also informed by the absence of any suggestion in the record before the court of any intention or planning on Mr. Miller's part to gain some kind of advantage (either economic or from a grade-enhancement perspective) from the incident. Mr. Ackermann was brought into this civil lawsuit involuntarily; he seeks nothing from Mr. Ackermann and, obviously, is in a very different position from Ms. Thomas in that respect.

Considering the totality of the circumstances, the court finds that information concerning Mr. Miller's grades, his participation in a study-abroad abroad program, and his financial-aid package (including scholarships) falls outside even the expansive definition of relevancy this court is bound to apply. Neither is the production of this information proportional to the needs of the case, where it logically bears little importance to the questions of whether Mr. Miller published false information about Mr. Ackermann to third parties or whether he conspired with Ms. Thomas and her mother to spread false claims. Notably, Mr. Ackermann already knows what Mr. Miller said at the misconduct hearing and in any written statement Mr. Miller may have submitted in connection with that proceeding. Mr. Ackermann also had the opportunity to depose Mr. Miller, Ms. Thomas, and Christine Thomas, and to ask them in detail about their interactions following the incident.

Mr. Miller suggests that the DU Subpoena is designed "to annoy, harass, and/or embarrass" him. ECF No. 67 at 7. The court declines to ascribe these motives to Mr. Ackermann's counsel, who are vigorous advocates for their client. Nevertheless, the court cannot help but conclude, based on a thorough consideration of the record, that it is a very large stretch to assert that the information sought in the DU Subpoena concerning Mr. Miller falls within the parameters of relevance and proportionality in this matter. In the court's view, Mr. Miller has

met his burden to persuade the court that the subpoena should be quashed, *see Bales*, 2019 WL 1454696, at *1, a conclusion further bolstered by the lack of relevance and proportionality of the information sought.

Therefore, the court **GRANTS** Mr. Miller's Motion to Quash the DU Subpoena as to Requests #1, #2, #9, and #10, insofar as those requests seek information concerning Mr. Miller. In addition, for the reasons set forth in its analysis of the DU Subpoena concerning Ms. Thomas, the court **GRANTS** Mr. Miller's Motion as to Requests #3 and #4. In sum, Mr. Miller's Motion to Quash is **GRANTED in its entirety**.

### C.   The High School Subpoenas

In the JCPS and GCSD Subpoenas, Mr. Ackermann seeks information about Ms. Thomas's and Mr. Miller's conduct as high school students.

#### 1.   The GCSD Subpoena

Start with Mr. Miller and the GCSD Subpoena. Mr. Ackermann seeks Mr. Miller's high school transcripts (Request #1) and "all communications relating to" his grades (Request #2); "all communications" between Mr. Miller and school district personnel about "discipline, misconduct, any acts of violence by anyone, any reports by Tyler Miller to GCSD of misconduct or violence by anyone else" (Request #3); and "any documents relating to allegations against Tyler Miller by any person" (Request #4). ECF No. 72-1 at 5.

Taking Request #4 first, the court cannot fathom how the school district would begin to attempt to locate all documents bearing some relation to "allegations against Tyler Miller by any person." This immensely broad and unbounded query admits of no readily discernible limitations and, on its face, imposes an undue burden on the entity compelled to respond. Does "allegation"

include, for example, a statement on an exam paper by a teacher asserting: "Tyler, I think you didn't study for this test"? And does the request oblige the school district to search the email accounts of every GCSD official for references to Tyler Miller to identify some "allegation" about him—a search that conceivably would sweep within its scope everything from comments about Mr. Miller's being late for class to, possibly, a teacher's reflection that he was a superior student anticipated to graduate at the top of his class? Request #4 would seem to encompass both of these examples, along with innumerable others that may in some way attribute an action, or inaction, to Mr. Miller.

Critically, the request bears no rationally identifiable connection to any issue in the instant case, the focus of which is on *Mr. Ackermann's* alleged assaultive conduct. Whether or not *Mr. Miller* was the subject of "allegations" when he was in high school does not tend to make a fact at issue in this action more or less probable than it would be without the evidence. *See* Fed. R. Evid. 401. Neither does the record here plausibly indicate that Mr. Miller's response following the incident in March 2022 was somehow motivated by, or of a piece with, his actions as a boy in high school. Such an idea—and the implicit underlying assumption that Mr. Miller harbored the nefarious intention to turn the incident between Mr. Ackermann and Ms. Thomas into an opportunity for his personal financial gain—finds no support in the record the parties have presented to the court. Indeed, these propositions are seemingly cut from whole cloth. But "[t]he relevance and proportionality requirements in Rule 26(b)(1) do not permit a requesting party 'to engage in a fishing expedition in the hopes that he may turn up some relevant or useful information.'" *Davis v. United States Dep't of Veterans Affairs*, No. 17-cv-00701-CBS, 2017 WL 3608192, at *8 (D. Colo. Aug. 22, 2017), *aff'd*, 730 F. App'x 571 (10th Cir. 2018); *see also*

*Rickaby v. Hartford Life & Accident Ins. Co.*, No. 15-cv-00813-WYD-NYW, 2016 WL 1597589, at *2 (D. Colo. Apr. 1, 2016) ("Rule 26(d), although broad, has never been a license to engage in an unwieldy, burdensome, and speculative fishing expedition."). While the court respects Mr. Ackermann's right to vigorously pursue his claims and defenses, a neutral evaluation of the record compels the court to find that Request #4 bears little relevance to the case and is disproportional to the needs of the litigation.

The court reaches the same conclusion with regard to the other requests in the GCSD Subpoena. The court cannot find even an attenuated connection between the high school transcripts (and "all communications" related to those grades) of Mr. Miller, a person who seeks no relief from Mr. Ackermann in this case, and Mr. Ackermann has offered no evidence or argument that would support such a finding. The supposition seemingly underlying Mr. Ackermann's position—that Mr. Miller was party to an intentional scheme to reap financial gain by means of a "false narrative" about Mr. Ackermann's actions the evening of March 3, 2022—would appear to spring entirely from Mr. Ackermann's own "narrative" about the incident. Absent some modicum of objective support for that supposition, which is not apparent here, the court declines to permit inquiry into the tangential matter of Mr. Miller's high school record, which is simply too far afield to fall within the bounds of relevant and proportional discovery.

Finally, the court also finds irrelevant and disproportional to the needs of this litigation that aspect of the GCSD Subpoena seeking "[a]ll Communications between any GCSD Personnel and Tyler Miller related to his discipline, misconduct, any acts of violence by anyone, any reports by Tyler Miller to GCSD of misconduct or violence by anyone else." Request #3. The instant case was not precipitated by any alleged misconduct of Mr. Miller, and Mr.

Ackermann has offered no justification for the court to permit his delving into Mr. Miller's high school records to see if something Mr. Miller may have done as an adolescent could cast him in an unfavorable light here.[18] And if Mr. Miller made some report about the misconduct of a high school student in Garfield County years ago, such a report would have no evidentiary consequence here, in a case focused on *Mr. Ackermann's* allegedly violent conduct directed toward a student at the University of Denver. Put another way, Mr. Miller's conjectural involvement as a witness in a disciplinary matter addressed by high school administrators long before the incident on March 3, 2022, is wholly unrelated to any claim or defense raised in this matter, and Mr. Ackermann's burdensome demand to compel the high school to unearth "all communications" on that tangential topic is neither relevant nor proportional to the needs of this case.

For these reasons, the court **GRANTS** Mr. Miller's Motion to Quash the GCSD Subpoena, ECF No. 72, in its entirety.

### 2.    The JCPS Subpoena

In the JCPS Subpoena, Mr. Ackermann seeks similar information of high school vintage concerning Ms. Thomas. The court's analysis of Mr. Ackermann's demand for high school era information concerning Mr. Miller applies equally with regard to Ms. Thomas, with several

---

[18] The court perceives that Mr. Ackermann seeks to portray Mr. Miller as a person prone to aggressive behavior. Mr. Ackermann makes it a point to allege that Mr. Miller "is the son of a law enforcement officer and a Mixed Martial Arts afficionado [sic] who frequently boasts of his skills with knives and guns," ECF No. 91 ¶ 54, from which this court infers that Mr. Ackermann regards Mr. Miller as a person disposed to violence or at least bravado. Mr. Ackermann may posit that litigation theory, but these allegations do not affect the court's assessment that the information sought in the GCSD subpoena falls outside the parameters of relevance or proportionality.

exceptions that bear on her damages claims.

First, the court finds that the Motion to Quash should be denied in part with respect to Request #1, which seeks Ms. Thomas's Jefferson County Public School transcripts. Ms. Thomas asserts that this information has "no bearing on and . . . nothing to do with the claims or defenses in this case," ECF No. 69 at 7, but she overstates the point. She has, after all, made an issue of her grades in the instant case (her mother represented that Ms. Thomas graduated from an International Baccalaureate Program with a 4.8 grade point average), and the purportedly negative impact on her grades following the March 2022 incident. The court, however, limits Request #1 to Ms. Thomas's high school transcript, recognizing that the grades she earned as a child in grade school are too remote in terms of time and her own maturity as to render them irrelevant. Ms. Thomas's high school grades, on the other hand, provide a relevant context for assessing her damages claim here, particularly because the March 2022 incident occurred in relatively close proximity to her high school graduation. Moreover, the ease with which her high school transcript may be generated negates any questions of burdensomeness and disproportionality. Therefore, the Motion to Quash is denied insofar as it seeks **Ms. Thomas's high school transcript only**.

The court reaches a different conclusion with respect to Mr. Ackermann's related request for "all communications" among Jefferson County Public School officials relating to Ms. Thomas's grades. Request #2. This request—unbounded by types of "communications," terms, custodians, and dates—would require many hours of JCPS time to unravel and to no discernible purpose of significance to this lawsuit. To the extent Mr. Ackermann supposes that Ms. Thomas has earned high grades by means of twisting the arms of school officials, the court has been

apprised of no objectively reasonable support for that presumption; moreover, Mr. Ackermann was able to question Ms. Thomas at length about her grades in deposition. The court declines to burden a Colorado school district with the task of digging up all emails and all other forms of "communications" that might touch in some tangential way on the topic of Ms. Thomas's grades.

The court finds that Requests #3 and #4, seeking all communications of all JCPS personnel about Danielle or Christine Thomas or with one of the Thomases—again, uncircumscribed as to topic, date, custodian, or type of communication—are of a similar ilk to the broad and scattershot Requests #3 and #4 in the DU Subpoena. For the same reasons that the court quashed those aspect of the DU Subpoena, it finds that the parallel requests in the JCPS Subpoena are not designed to elicit relevant or proportional information. The court therefore grants the Motion to Quash the JCPS Subpoena with respect to Requests #3 and #4.

Requests #5 and #6, which seek "[a]ll Documents reflecting any treatment for Danielle Thomas at any counseling, medical, mental health facility at JCPS" and "[a]ll Documents reflecting any treatment for Danielle Thomas for any counseling, medical, or mental health services at JCPS," are subject to an analysis similar to that delineated above in connection with Requests #5 and #6 of the DU Subpoena. Given that Ms. Thomas graduated high school just three years ago, her high school medical and mental health treatment records are not so distant in time as to render them irrelevant to her instant claims for damages to her physical and mental health. For example, if Ms. Thomas were diagnosed with a painful chronic disease in her senior year in high school, or if she sought treatment for some emotional trauma that occurred during her high school years, Mr. Ackermann may have a viable argument that the noneconomic damages she demands from him are attributable to other causes. Neither is the production of Ms.

34

Thomas's high school medical and mental health treatment records disproportional here, where she seeks economic damages in the hundreds of thousands of dollars.

In sum, with Ms. Thomas having made the alleged deterioration of her medical and mental health the centerpiece of this litigation, the court finds that the production of her JCPS medical and mental health treatment records is both relevant and proportional to the needs of this case. Requests #5 and #6 are approved insofar as they seeks **Ms. Thomas's high school medical and mental health treatment records only**.

Turning next to Requests #7 and #8 in the JCPS Subpoena, Mr. Ackermann seeks the same type of "misconduct allegations" concerning Ms. Thomas that he demanded in the GCSD Subpoena concerning Mr. Miller. *Cf.* GCSD Subpoena Request #3. For the reasons the court articulated above in granting the motion to quash the related aspect of the GCSD Subpoena, it finds that Requests #7 and #8 in the JCPS Subpoena seek information that is neither relevant nor proportional to the needs of this litigation and that would impose an undue burden on the School District to gather. Ms. Thomas's Motion to Quash is granted as to Requests #7 and #8.

Finally, in Request #9 in the JCPS Subpoena, Mr. Ackermann seeks any documents related to Ms. Thomas's "accommodation request(s)." The court sees this request differently from the parallel request in the DU Subpoena for documents concerning accommodations Ms. Thomas sought at the University after the March 2022 incident. At DU, Christine Thomas affirmatively raised an accommodation request and linked that request directly to the asserted physical and mental impact of the alleged assault on Danielle Thomas. *See* CTHOMAS_000029 (describing Danielle Thomas's "nightmares and panic attacks" and being harassed by Mr. Ackermann's "high cost private investigator"). No such causal link can be attached to any

accommodation Ms. Thomas may have sought in high school. Neither does the court find it proportional to the needs of this case to require JCPS to embark on a systemwide search for emails and other documents generated by any and all of its employees for any reference to an "accommodation" years before Ms. Thomas encountered Mr. Ackermann. The speculative assumption that Ms. Thomas might have made some request in high school that could be construed as an "accommodation" is too distant in time and too separated from Mr. Ackermann's alleged conduct to fall within the scope of Rules 26 and 45.

In accordance with the foregoing parameters, the court **GRANTS in part** and **DENIES in part** Ms. Thomas's Motion to Quash the JCPS Subpoena, ECF No. 69.

### D.    The Examination Resources Subpoena

Finally, the court addresses Mr. Ackermann's subpoena directed to Examination Resources, the employer of Christine Thomas. The court respectfully finds that the documents sought in this subpoena are so very far removed from the core issues in the instant litigation as to exceed the bounds of relevance and proportionality in this matter.

The subpoena, even more than the others at issue here, takes a throw-everything-at-the-wall approach which the court cannot countenance. Mr. Ackermann desires to take a deep dive into Christine Thomas's employment records, demanding "any documents" on a multitude of topics: her job application and resumes; descriptions of the positions she has held for the past five years; documents that "describe or calculate" the particular days when she has worked and when she has not, and that explain why she was not in the office on each occasion for the past five years; the names and contact information for each of her supervisors in the past five years; documents that "relate or pertain to" insurance policies she has held for the past five years; all

36

"documents reflecting" insurance claims for benefits paid on behalf of Danielle Thomas for an unlimited period of time; and, vaguely and extremely broadly, any "documents that reference or relate to" Danielle Thomas generated for the past five years. The court finds that Examination Resources is not required to respond to any of these broad and burdensome requests, all of which unnecessarily intrude into Christine Thomas's privacy.

First, Christine Thomas has brought no claims against Mr. Ackermann and thus has not put her private personal information—including that contained in her employment records—at issue. Second, information presented to the court in connection with the hearing on the Motions to Quash shows that counsel for Mr. Ackermann rebuffed the good-faith efforts of counsel for Examination Resources to confer about the subpoena. *See* 11/30/2023 Letter to Menninger and O'Harris re: Document Subpoena: Examination Resources, LLC's Objections and Responses at 1-2 (discussing attempts by attorney Benton Barton at Hall & Evans to confer with Laura Menninger and Meredith O'Harris). As counsel for Examination Resources noted, "I think we should try to [confer] before spending additional attorney time and judicial resources on litigation efforts. I believe the Magistrate Judge would appreciate these efforts and they would go a long way to satisfying the spirit and letter of her practice standards." *Id.* at 2. Exactly so. And, regrettably, an opportunity lost that necessitates this order on the Motion to Quash the Examination Resources Subpoena.

Third, there are obvious alternative means by which Mr. Ackermann can obtain information about Christine Thomas's employment history, short of issuing a massively burdensome subpoena to her employer. *See* Rule 26(b)(2)(C) ("court must limit the . . . extent of discovery otherwise allowed by these rules or by local rule if it determines that the discovery . . .

can be obtained from some other source that is more convenient, less burdensome, or less expensive"). Christine Thomas herself can provide information about each of the topics in the Examination Resources Subpoena. *See* 11/30/2023 Letter at 4 (noting Christine Thomas's agreement to provide her resume, job description, the start date of her employment, and the name of her current supervisor). She can testify about whether she has utilized insurance coverage for treatment for her daughter—which, in fact, is of secondary importance to the information Mr. Ackermann will obtain via the production of treatment records for Danielle Thomas.

Finally, the court observes that Request #7, seeking five years' worth of "documents" maintained by the company that "reference or relate to Plaintiff Danielle Thomas," exemplifies the overbreadth and burdensomeness of the Examination Resources Subpoena. It may be that a remark about Danielle Thomas would be unearthed in, say, a search of the email accounts of hundreds of employees at her mother's company. But any such reference is likely to be of marginal relevance in a case which fundamentally boils down to who is the more credible of two teenagers in recounting their encounter in Mr. Ackermann's dormitory room in March 2022. In exercising its "broad discretion" in evaluating the Motions to Quash, *see Kenno*, 2023 WL 2967692, at *7, the court insists upon a balanced, reasoned approach, and the Examination Resources Subpoena is at odds with that.

Accordingly, the court **GRANTS** Christine Thomas's Motion to Quash the Examination Resources Subpoena, ECF No. 74. The court further **DENIES without prejudice** Christine Thomas's related request for entry of a protective order "forbidding the disclosure or discovery of, and forbidding any inquiry into, whether via written discovery or deposition Requests Nos. 3, 4, 5, 6, and 7" in the Examination Resources Subpoena. *Id.* at 12. As noted above, Christine

Thomas is the best and most direct source of the information sought in the Examination Resources Subpoena, and she is on record as agreeing to provide at least a portion of that information. The court declines to prejudge, in a blanket fashion, every written discovery request or deposition question directed to Christine Thomas without the opportunity to review the specifics of those inquiries.

## II.    Motion for Attorney Fees

Next before the court is Mr. Ackermann's Motion for Attorney Fees Under Fed. R. Civ. P. 37. ECF No. 89 ("Attorney Fees Motion"); *see also* ECF No. 90 (order referring motion). In the Attorney Fees Motion, Mr. Ackermann seeks $16,855.00 for fees and costs associated with his counsel's work in connection with issues raised at a discovery dispute conference conducted by this court on December 28, 2023. *See* ECF No. 81, Courtroom Minutes for 12/28/2023 Discovery Hearing; *see also* ECF No. 89-4 (explication of fees and costs incurred by attorneys at Haddon Morgan & Foreman). The motion is opposed by Danielle Thomas (ECF No. 95), Christine Thomas (ECF No. 93), and Mr. Miller (ECF No. 94). Mr. Ackermann filed a reply. ECF No. 96. After a careful review of the briefing, all relevant aspects of the docket, and the applicable law, the court **DENIES** the motion.

### A.    Legal Standards

Rule 37(a)(5)(A) requires the court to award the party prevailing on a motion to compel discovery its "reasonable expenses incurred in making the motion, including attorney's fees," unless the moving party failed to comply with the "meet and confer" requirement, the opposing party had substantial justification for its position, or "other circumstances make an award of expenses unjust." Fed. R. Civ. P. 37(a)(5)(A). "[D]istrict courts enjoy 'very broad discretion to

use sanctions where necessary to insure . . . that lawyers and parties . . . fulfill their high duty to insure the expeditious and sound management of the preparation of cases for trial.'" *Lee v. Max Intern., LLC*, 638 F. 3d 1318, 1320 (10th Cir. 2011) (quoting *In re Baker*, 744 F.2d 1438, 1440 (10th Cir. 1984)); *see also Stenson v. Edmonds*, 86 F.4th 870, 875 (10th Cir. 2023) ("We review a district court's decision about the amount of attorney fees to award under Rule 37(a)(5)(A) for an abuse of discretion.") (citing *Centennial Archaeology, Inc. v. AECOM, Inc.*, 688 F.3d 673, 678 (10th Cir. 2012)). "Determination of the correct sanction for a discovery violation is a fact-specific inquiry that the district court is best qualified to make." *Ehrenhaus v. Reynolds*, 965 F.2d 916, 920 (10th Cir. 1992).

"The Supreme Court has described the test of 'substantially justified' under Rule 37 as 'a genuine dispute or if reasonable people could differ as to the appropriateness of the contested action.'" *Lester v. City of Lafayette*, 639 F. App'x 538, 542 (10th Cir. 2016) (quoting *Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (cleaned up)). "'Substantially justified' connotes 'not justified to a high degree, but rather justified in substance or in the main—that is, justified to a degree that could satisfy a reasonable person.'" *Id.* (quoting *Pierce*, 487 U.S. at 565) (internal quotation marks omitted).

B.     Analysis

As is apparent from the preceding discussion concerning the Motions to Quash, discovery in the instant litigation has been marked by a considerable degree of contention and disagreement among the parties. The court begins its analysis of the Attorney Fees Motion by laying out the events that served as a prelude to the filing of that motion.

On December 28, 2023, to assist the parties in resolving a number of accumulated

discovery disputes, the court conducted an in-person discovery conference pursuant to its informal discovery dispute procedures.[19] The court was asked to address a number of questions, including Mr. Ackermann's objections to certain responses to his interrogatories and requests for production of documents from each opposing party. *See* 12/26/2023 Ackermann Discovery Statement at 2-4 (listing, collectively, 37 allegedly deficient responses from Danielle Thomas, Christine Thomas, and Tyler Miller).

In the Attorney Fees Motion, Mr. Ackermann argues that this court "agreed with every deficiency set forth in Mr. Ackermann's motion and fully granted his requests to compel disclosures." Attorney Fees Motion at 6; *id.* at 1 (asserting that Mr. Ackermann "prevail[ed] on <u>all</u> of the disputes set forth in his motion to compel as ruled upon at the December 28, 2023 hearing") (emphasis in original). The decisions rendered by the court at the discovery conference are more nuanced than Mr. Ackermann's statements suggest.

To be sure, the court directed that responses be provided to Mr. Ackermann's discovery requests seeking information about communications by Danielle Thomas, Christine Thomas, and Mr. Miller with other individuals about Mr. Ackermann and the March 2022 incident. Transcript of 12/28/2023 Discovery Conference, ECF No. 87 at 58:19-21 ("[Y]ou've got to dig deep to find out the communications that post-date this incident that are about this incident."); *id.* at 58:22-24 ("And so to the extent there's any confusion about that, let me make that clear, those

---

[19] Since that time, this court has joined with the United States Magistrate Judges in this District in adopting uniform civil practice standards. This court's individualized informal procedures for resolving discovery disputes, *see* Uniform_Civil_Practice_Standards_Magistrate_Judges_April2024.pdf (uscourts.gov), at 15, 18-19 (effective April 1, 2024).

communications must be produced, and there must be an effort made to find them."). The court also directed that the opposing parties respond to Mr. Ackermann's requests for production seeking their written communications about Mr. Ackermann. *Id.* at 63:12-21 (ordering the production of such communications, including by means of searching devices and social media accounts, and finding the request "to be reasonably drawn . .  and reasonable and proportional to the case"). However, the court also found that other disputes were more complex and did not admit of ready resolution in an informal discovery conference setting.

Of particular significance, with regard to the parties' disagreement concerning the production of certain of Danielle Thomas's mental health treatment and counseling records, the court concluded—after hearing extensive argument from the parties—that the better course was to consider that issue on full briefing in the context of a formal discovery motion. ECF No. 87 at 133:17-24 (observing that the mental-health treatment issue was a "complex thing to resolve absent full briefing" and "really does require a full motion, particularly since it implicates" others, including Christine Thomas); *id.* at 176:16-20 (verifying with counsel that a separate motion would be filed concerning the mental-health records issue). Therefore, at the discovery conference, the court did not issue any specific directive concerning the treatment and counseling records, save to observe that it expected to see the docketing of a formal motion. No such motion was filed, however, and further conferral among the parties ultimately led to the production of "hundreds of pages of medical records, including therapy records from before and after the [March 2022] incident." *See* Attorney Fees Motion at 9; *see also* ECF No. 95 at 4 (after the discovery conference, counsel for Danielle Thomas "produced some 325 bates-numbered pages (with some redaction) of past medical and family counselor records for Danielle, with such

medical records going back as far as to when she was three years old").

Discussions on other topics continued after the discovery conference, resulting in agreements among the parties to undertake certain actions that were not expressly ordered by this court. Danielle Thomas, for example, agreed to hire a forensic examiner to review the contents of her electronic devices. ECF No. 95 at 4 (stating that Danielle Thomas had "retained a professional ESI forensic examiner on or about January 6, 2024, that commenced and produced thereafter through later in January and into early February 2024 results of its exams to Danielle's cell phone, lap-top and emails"); *see also* ECF No. 87 at 76:2-16 (stating that the court would not order a forensic examination except in the context of a formal motion filed after conferral among the parties).

The run-up to the December 28, 2023 discovery conference is also pertinent to the court's evaluation of the relief Mr. Ackermann seeks in the Attorney Fees Motion. It is evident to the court from the discovery statements provided by Danielle Thomas, Christine Thomas, and Tyler Miller before the discovery conference each of them agreed during the pre-conference conferral process to supplement their responses to at least some of Mr. Ackermann's discovery requests. While these proposed supplementations may not have encompassed everything to which Mr. Ackermann deemed himself entitled—or everything which this court ultimately directed be produced—on this record, the court finds no reason to question the good faith of the parties in attempting to address Mr. Ackermann's concerns.

Informed by this context, the court finds that the circumstances here do not justify an

award of costs and fees.[20] To begin with, this is not a situation in which the parties were unresponsive to Mr. Ackermann's concerns. They conferred with him; agreed to supplement some of their responses; prepared discovery statements on the disputed issues with citations to supporting legal authority; and argued for their respective positions in a lengthy discovery dispute conference. And while Mr. Ackermann asserts that this court "implicitly" found that the opposing parties' positions were not "substantially justified," Attorney Fees Motion at 6-7, the court respectfully views the situation differently. The court ruled in Mr. Ackermann's favor on several issues, but it did *not* find that the positions adopted by the opposing parties were so devoid of legal or factual support as to render them "unjustified"—that is, there was no finding that reasonable people could not take differing views of those issues. *See Lester*, 639 F. App'x at 542. Importantly, the court would have taken great care before making a finding that any position adopted by any party (including Mr. Ackermann) lacked substantial justification. The court was not asked to make that determination at the informal discovery conference, and the

---

[20] The parties opposing the Attorney Fees Motion assert that it should be denied outright because the court handled the dispute by means of its informal procedures rather than a formal motion to compel. *See* ECF No. 94 at 4 ("Because no Rule 37 motion to compel was filed or granted, Rule 37, and its provisions related to an award of attorney fees, are inapplicable."); ECF No. 95 at 5 ("No expense recovery under Rule 37(a)(5) exists or can be granted if no Rule 37(a) motion is made."); ECF No. 93 ¶¶ 2-3 (noting the absence of a formal motion to compel as a basis for denying the Attorney Fees' Motion). However, judges on this court have recognized that they have discretion to award reasonable expenses to a prevailing party in a discovery dispute, even if no formal motion is filed. *See* Uniform Civil Practice Standards, § VI.1. ("In the event a party prevails in a discovery dispute, *and regardless of whether the Court permits a discovery motion*, the Court has the discretion to award reasonable expenses, including attorney's fees, consistent with Fed. R. Civ. P. 37(a)(5)(A).") (emphasis added).

Regardless, the court proceeds on the assumption that it may exercise its discretion to award expenses, but finds that such an award is not warranted under the circumstances here.

court's review of the transcript of the conference confirms that no such finding was made.[21]

Now that the issue of substantial justification is squarely before the court, the court expressly finds that the grounds put forward at the discovery conference by each of the opposing parties—Danielle Thomas, Christine Thomas, and Tyler Miller—were substantially justified. Although the opposing parties did not prevail on several of the issues addressed at the conference, the lenient standard for finding substantial justification is met here. Their positions on every point may not have been "justified to a high degree," but they were "justified in substance or in the main"—in other words, justified to the extent that a reasonable person could be satisfied of their merit. *Lester*, 639 F. App'x at 542. Put another way, the issues the court considered at the discovery conference reflected a "genuine dispute" between the parties. *See Pierce*, 487 U.S. at 565 (describing motion as justified if there is a "genuine dispute") (quoting Advisory Committee's Notes on 1970 Amendments to Fed. R. Civ. P. 37(a)(4)). The fact that the court agreed with Mr. Ackermann on some of these "genuine disputes" does not require a finding that an attorney's fees sanction under Rule 37(a)(5)(A) is appropriate. "A position can be substantially justified *even if not correct*, provided it has a reasonable basis in law and fact." *Ladenburger v. Colvin*, No. 15-cv-02182-RM, 2018 WL 11477186, at *1 (D. Colo. Apr. 20, 2018) (citing *Pierce*, 487 U.S. at 566 n.2) (emphasis added). The court so finds here.

The conclusion that the positions of the opposing parties positions were substantially justified ends the matter, but the court deems it appropriate to explain that it also finds an award of fees and expenses to Mr. Ackermann here would be unjust, and thus in contravention of Rule

---

[21] The transcript makes no reference to Rule 37 or sanctions under that Rule, nor were the terms "justification," "justified," or "substantially justified" utilized during that lengthy proceeding.

Case No. 1:23-cv-00721-RMR-SBP  Document 121  filed 05/31/24  USDC Colorado  pg 46 of 49

37(a)(5)(A)(iii). With this provision, "a necessary flexibility is maintained, since the court retains the power to find that other circumstances make an award of expenses unjust—as where the prevailing party also acted unjustifiably." Fed. R. Civ. P. 37(a) advisory committee's note to 1970 amendment.

The court's conclusion is premised on its view that nothing in the record suggests that counsel for the opposing parties adopted a position at the discovery conference for any purpose other than zealous advocacy on behalf of their respective clients, informed by counsels' understanding of the guiding legal principles. Too, the court hesitates to find that sanctions may be justly imposed here, where it harbors some uncertainty as to whether Mr. Ackermann's counsel fully conferred with opposing counsel before filing the Attorney Fees Motion. Each opposing party asserts there was no conferral. ECF No. 93 at 1 ("Contrary to Ackermann's representation, his counsel did not confer with counsel for Christine Thomas prior to filing the Motion for Attorney Fees."); ECF No. 94 at 1 ("To begin, Ackermann represents he conferred with counsel for all parties before filing this motion. That is incorrect, as no attempt at conferral was made."); ECF No. 95 at 5 n.2 ("Contrary to what is asserted at pg. 2, of [the Attorney Fees Motion], Defendants counsel did not confer with the undersigned on such Motion prior to its January 26th filing."). Mr. Ackermann contends otherwise, ECF No. 96 at 2-3, but the conferrals to which he points occurred *before* the discovery conference; they do not reflect a conferral about his supposed entitlement to expenses *after* that conference—a materially different question. *See id.*; *see also* ECF Nos. 96-1 to 96-3 (conferral emails predating the discovery conference). In this court, with limited exceptions that do not apply here, conferral is required before the filing of every motion. *See* D.C.COLO.LCivR 7.1(a) ("Duty to Confer. Before filing a

motion, counsel for the moving party or an unrepresented party shall confer or make reasonable, good faith efforts to confer with any opposing counsel or unrepresented party to resolve any disputed matter.").

From a larger perspective, discovery in this case has been contentious and the fortunes of the parties have fluctuated with the particular issues raised. The Motions to Quash and the disputes that Mr. Ackermann raised are essentially contemporaneous. The court heard the former on December 7, 2023 (ECF No. 78, minutes) and the latter on December 28, 2023. Mr. Ackermann may have come out on the winning side of more issues at the informal discovery conference, but—as this very Order emphasizes—he certainly cannot be said to have prevailed on the majority of the issues raised in the Motions to Quash. Arguably, in issuing such broad subpoenas implicating the opposing parties' privacy interests—and initially declining to even confer with Examination Resources' counsel (*see* letter of Benton J. Barton addressed to Ms. Menninger and Ms. O'Harris, dated November 30, 2023) regarding its objections—Mr. Ackermann's counsel acted unjustifiably. While the court's decision to quash various aspects of Mr. Ackermann's third-party subpoenas does not mandate a particular outcome with respect to his Attorney Fees Motion, it is illustrative of a larger point: when it comes to discovery, no party here—including Mr. Ackermann—is immune from criticism. The court takes that point into account in exercising its broad discretion to decline to award sanctions under Rule 37(a)(5).

For these reasons, the court **DENIES** Mr. Ackermann's Attorney Fees Motion, ECF No. 89.

## CONCLUSION

In accordance with the foregoing, it is hereby **ORDERED**:

- Third-Party Defendant Tyler Miller's Motion to Quash Subpoena *Duces Tecum*, ECF No. 67, to the University of Denver, is **GRANTED**;

- Plaintiff and Counterclaim Defendants Danielle Thomas's Motion to Quash or Quash in Part November 1, 2023 Subpoena to Produce Documents, Etc., to University of Denver, or in the Alternative for Protection under Fed. R. Civ. P. 26 from Such Subpoena, ECF No. 68, is **GRANTED in part and DENIED in part**;

- Danielle Thomas's Motion to Quash Subpoenas to Produce Documents, Etc., to Two Public School Districts, ECF No. 69, is **GRANTED in part and DENIED in part**;

- Tyler Miller's Motion to Quash Subpoena *Duces Tecum* to Garfield County School District 16, ECF No. 72, is **GRANTED**;

- Third-Party Defendant Christine Thomas's Motion to Quash Subpoena Duces Tecum to Examination Resources, LLC, ECF No. 74, is **GRANTED**. Christine Thomas's related motion for entry of a protective order, *id.* at 12, is **DENIED without prejudice**; and

- Defendant, Counterclaim Plaintiff, and Third-Party Plaintiff Angus Ackermann's Motion for Attorney Fees Under Fed. R. Civ. P. 37, ECF No. 89, is **DENIED**.[22]

---

[22] Rule 72 of the Federal Rules of Civil Procedure provides that within fourteen (14) days after service of a Magistrate Judge's order or recommendation, any party may serve and file written objections with the Clerk of the United States District Court for the District of Colorado. 28 U.S.C. §§ 636(b)(1)(A), (B); Fed. R. Civ. P. 72(a), (b). Failure to make any such objection will result in a waiver of the right to appeal the Magistrate Judge's order or recommendation. *See Sinclair Wyo. Ref. Co. v. A & B Builders, Ltd.*, 989 F.3d 747, 782 (10th Cir. 2021) (firm waiver rule applies to non-dispositive orders); *but see Morales-Fernandez v. INS*, 418 F.3d 1116, 1119, 1122 (10th Cir. 2005) (firm waiver rule does not apply when the interests of justice require review, including when a "pro se litigant has not been informed of the time period for objecting and the consequences of failing to object").

DATED: May 31, 2024                    BY THE COURT:

_____

Susan Prose
United States Magistrate Judge